

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| JOY SWEENEY, | ) |
| | ) |
| APPELLANT, | ) WD85679 |
| | ) |
| v. | ) OPINION FILED: |
| | ) September 12, 2022 |
| JOHN R. ("JAY") ASHCROFT, IN | ) |
| HIS OFFICIAL CAPACITY AS | ) |
| MISSOURI SECRETARY OF | ) |
| STATE, | ) |
| | ) |
| RESPONDENT, | ) |
| | ) |
| and | ) |
| | ) |
| LEGAL MISSOURI 2022 and JOHN | ) |
| PAYNE, | ) |
| | ) |
| RESPONDENTS. | ) |

**Appeal from the Circuit Court of Cole County, Missouri**
The Honorable Cotton Walker, Judge

Before Special Division: Cynthia L. Martin, Presiding Judge, Anthony Rex Gabbert, Judge, and Thomas N. Chapman, Judge

Joy Sweeney ("Sweeney") brought challenges to the Secretary of State's

("Secretary") certification of an initiative petition as Amendment 3 for inclusion on the

November 8, 2022 general election ballot. Legal Missouri 2022 and John Payne ("Proponent") intervened, and were aligned with the Secretary in defending certification of the initiative petition. Following a trial, the circuit court entered a judgment on the merits pursuant to Rule 73.01(b),[1] finding that Sweeney's lawsuit failed for want of jurisdiction because Sweeney failed to put on evidence to establish her standing to challenge the Secretary's certification of the initiative petition. The judgment also determined the substantive merits of Sweeney's challenges, and ruled in favor of the Secretary and Proponent on Sweeney's claims. Sweeney filed this appeal.

We reverse the circuit court's judgment to the extent that it granted Rule 73.01(b) motions to find that Sweeney did not prove she had standing. We affirm the circuit court's judgment in favor of the Secretary and the Proponent and against Sweeney on the merits of Sweeney's challenges to the Secretary's certification of the initiative petition. As a result, we hold that the Secretary's certification of the initiative petition was proper, permitting the initiative petition to be placed on the ballot for the November 8, 2022 general election.

**Factual and Procedural Background**

Proponent filed a sample form of an initiative petition with the Secretary on or about August 27, 2021, seeking to amend the Missouri Constitution to legalize the recreational use and possession of marijuana in certain circumstances, and to authorize steps to relieve persons of the criminal consequences of past marijuana use and possession made lawful by

---

[1]All Rule references are to Missouri Court Rules, Volume I -- State 2022 unless otherwise noted.

the amendment. The initiative was identified by the Secretary as Initiative Petition No. 2022-59, and was given the title "Marijuana Use and Expunging Cannabis Related Criminal Records" (hereinafter "Initiative Petition").[2] On October 6, 2021, the Secretary approved the form of the Initiative Petition and certified a ballot title for circulation.

On or about May 8, 2022, Proponent submitted signatures of registered voters in support of the Initiative Petition. The Secretary thereafter sent copies of signature pages to various local election authorities to verify that the persons whose names were listed as signers on the submitted pages were registered voters in their claimed counties and congressional districts. The Secretary determined after this process that some signers designated as unregistered voters by local election authorities were, in fact, registered voters, and treated those signatures as valid. The Secretary then determined that Congressional District numbers 1, 2, 3, 5, 6, and 7 had sufficient signatures to satisfy constitutional requirements for certification of the Initiative Petition, and that Congressional District numbers 4 and 8 did not have sufficient signatures to satisfy constitutional requirements. Because the Secretary determined that a sufficient number of valid signatures in favor of the Initiative Petition had been secured in six of Missouri's eight Congressional Districts, the Secretary issued a Certificate of Sufficiency for the Initiative Petition on August 9, 2022, permitting the matter to be placed on the ballot for the November 8, 2022 general election as Amendment 3.

---

[2]The Initiative Petition is lengthy. The Initiative Petition can be found on the Secretary's website at https://www.sos.mo.gov/CMSImages/Elections/Petitions/2022-059.pdf

3

On August 19, 2022, Sweeney filed a petition in the Circuit Court of Cole County, Missouri pursuant to section 116.200.1,[3] challenging the Secretary's certification of the Initiative Petition for placement on the November 8, 2022 general election ballot ("Election Challenge"). Sweeney's petition alleged that Sweeney was a "citizen, legal voter, resident, and taxpayer of the State of Missouri." Sweeney's petition alleged that the Secretary improperly certified the Initiative Petition for two reasons: (i) because the Secretary violated section 116.130 by certifying and counting signatures that were marked through by local election authorities, and absent this, the Initiative Petition would not have had a sufficient number of valid signatures to permit its certification; and (ii) because the Initiative Petition contains multiple subjects in violation of the single subject requirement described in article III, section 50 of the Missouri Constitution. Sweeney's petition asked the circuit court to enjoin the Secretary from certifying the Initiative Petition for placement on the ballot for the November 8, 2022 general election.[4]

Proponent was granted leave to intervene in the Election Challenge on September 1, 2022, and filed an answer to Sweeney's petition on September 2, 2022, aligning with the Secretary in defending certification of the Initiative Petition. Proponent's answer denied that Sweeney was a citizen, legal voter, resident, and taxpayer of the State of Missouri. The

---

[3]All statutory references are to RSMo 2016 as supplemented through August 27, 2021, the date the sample form of the Initiative Petition was filed, unless otherwise noted.

Section 116.200.1 provides that "[a]fter the secretary of state certifies a petition as sufficient or insufficient, any citizen may apply to the circuit court of Cole County to compel him to reverse his decision. The action must be brought within ten days after the certification is made. All such suits shall be advanced on the court docket and heard and decided by the court as quickly as possible."

[4]Section 116.200.2 provides that "[i]f the court decides the petition is sufficient, the secretary of state shall certify it as sufficient and attach a copy of the judgment. If the court decides the petition is insufficient, the court shall enjoin the secretary of state from certifying the measure and all other officers from printing the measure on the ballot."

4

Secretary filed an answer to Sweeney's petition on September 6, 2022. The Secretary's answer denied on information and belief that Sweeney was a citizen, legal voter, resident, and taxpayer of the State of Missouri. The circuit court expedited resolution of the Election Challenge as required by section 116.200.1.

Following an abbreviated trial to the court on the afternoon of September 8, 2022, the circuit court entered its judgment on September 9, 2022 ("Judgment"). The Judgment reflected the circuit court's grant of the Secretary's and Proponent's motions for directed verdict at the close of Sweeney's case ("Rule 73.01(b) Motions")[5] because Sweeney failed to put on any evidence that she is a "Missouri resident," and thus failed to prove that she had standing to bring the Election Challenge under section 116.200.1.[6] The Judgment went on to explain that immediately after the Rule 73.01(b) Motions were made, Sweeney orally moved to reopen the evidence to permit her to put on testimony establishing Sweeney's standing to bring a section 116.200.1 challenge. The Judgment explained that the Secretary and Proponent objected to Sweeney's motion to reopen the evidence. Direct and cross-examination testimony was then taken from Sweeney as an offer of proof on the issue of her standing to file a section 116.200.1 action. The circuit court took the Rule 73.01(b) Motions and the request to reopen the evidence under advisement. The Judgment sustained the Secretary's and Proponent's objections to Sweeney's motion to reopen the evidence, and

---

[5]In a court tried case, a motion for directed verdict at the close of a plaintiff's case is not appropriate and is treated as a motion pursuant to Rule 73.01(b) for "a judgment on the grounds that upon the facts and the law the plaintiff is not entitled to relief." *See Radmacher v. Dir. of Revenue*, 405 S.W.3d 607, 609 n. 2 (Mo. App. W.D. 2013); *Williams v. Dir. of Revenue*, 335 S.W.3d 70, 72 n. 1 (Mo App. W.D. 2011). The circuit court's Judgment reflects that it treated the motions for directed verdict as motions pursuant to Rule 73.01(b).

[6]As noted, *supra*, in footnote 3, section 116.200.1 permits "any citizen" to file a challenge to the secretary of state's certification of an initiative petition. The Rule 73.01(b) Motions presumed the phrase "any citizen" means "Missouri resident." We address this subject, *infra*.

granted the Rule 73.01(b) Motions, and entered judgment against Sweeney on the merits on the grounds that Sweeney failed to put on evidence that she had standing. The Judgment expressly noted that in granting the Rule 73.01(b) Motions, the circuit court had not relied on or considered the offer of proof testimony.

The Judgment further noted that "since the issues raised in this matter are of significant importance and due to the expedited nature of a Section 116.200, RSMo challenge" it was appropriate for the circuit court to "to enter . . . supplemental findings of fact, [and] conclusions of law as a part of the ruling herein" to determine the substantive merits of Sweeney's Election Challenge. The Judgment made extensive findings of fact and conclusions of law on the merits of Sweeney's claims, and held that the Initiative Petition did not violate the single subject requirement set forth in article III, section 50 of the Missouri Constitution, and that the Secretary properly certified that the Initiative Petition had sufficient signatures to place the measure on the ballot for the November 8, 2022 general election as Amendment 3.

Sweeney immediately filed this appeal late in the afternoon on September 9, 2022, pursuant to section 116.200.3.[7]

---

[7]Section 116.200.3 provides that "[w]ithin ten days after a decision is rendered [on a petition challenging the secretary of state's certification of an initiative petition as either sufficient or insufficient], any party may appeal it to the supreme court." Under analogous circumstances, our courts have concluded that an attempt by statute to extend exclusive jurisdiction to the Supreme Court to entertain an appeal is of no effect unless the subject matter of the suit is within the scope of the Supreme Court's exclusive jurisdiction as provided in the Missouri Constitution. *See Boeving v. Kander*, 493 S.W.3d 865, 872-73 (Mo. App. W.D. 2016). For reasons hereinafter explained, "[t]his appeal does not raise any issue which would trigger the Supreme Court's exclusive appellate jurisdiction. Therefore, [section 116.200.3] cannot be read to authorize a direct appeal to the Supreme Court." *Id.* at 873.

6

## Expedited Appeal

Pursuant to section 115.125.3 RSMo. Supp 2018, "[n]o court shall have the authority to order an . . . issue be placed on the ballot less than eight weeks before the date of the election." In this appeal, we are being asked to determine whether the Secretary should certify the Initiative Petition for placement on the ballot for the November 8, 2022 general election, or be enjoined from certifying the Initiative Petition, with all other officers being commensurately enjoined from printing the measure on the ballot. Section 116.200.2; section 116.200.3. September 13, 2022 is thus the last date that this or any court will have the authority to order the Initiative Petition to be placed on the ballot for the November 8, 2022 general election. Section 115.125.3. We have therefore substantially expedited the disposition of this appeal.

## Appellate Jurisdiction

This "'Court has an obligation, acting *sua sponte* if necessary, to determine its authority to hear the appeals that come before it.'" *Maly Commercial Realty, Inc. v. Maher*, 582 S.W.3d 905, 910 (Mo. App. W.D. 2019) (quoting *Glasgow Sch. Dist. v. Howard Cnty. Coroner*, 572 S.W.3d 543, 547 (Mo. App. W.D. 2019) (citations and internal quotations omitted)). Our authority to hear appeals is influenced by whether the issues raised are ripe for review, and by whether the issues raised are subject to the exclusive appellate jurisdiction vested in the Supreme Court by article V, section 3 of the Missouri Constitution.

The power of the initiative is expressly reserved to the people in article III, section 49 of the Missouri Constitution. "When courts are called upon to intervene in the initiative

7

process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." B*rown v. Carnahan*, 370 S.W.3d 637, 645 (Mo. banc 2012) (quoting *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990)). Respectful of this restraint, the judiciary's authority to determine pre-election challenges to initiative petition ballot measures is extremely limited. "Before the people vote on an initiative, courts may consider only those threshold issues that affect the integrity of the election itself, and that are so clear as to constitute a matter of form." *Id.* (quoting *United Gamefowl Breeders Ass'n of Missouri v. Nixon*, 19 S.W.3d 137, 139 (Mo. banc 2000)). "As such, when initiative petitions are challenged, this Court's primary duty is to determine 'whether the constitutional requirements and limits of power, as expressed in the provisions relating to the procedure and form of initiative petitions, have been regarded.'" *Id.* (quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 827).

Sweeney's pre-election challenges to the Initiative Petition, which argue that the measure violates the single subject requirement of article III, section 50 of the Missouri Constitution, and that insufficient valid signatures were collected to authorize certification of the measure, satisfy this standard, and are ripe for our review.[8] *Boeving v. Kander*, 496 S.W.3d 498, 503-504 (Mo. banc 2016) (addressing pre-election challenges that insufficient

---

[8]Though Sweeney's pre-election challenges are authorized because they address compliance with statutory or constitutional provisions relating to the procedure and form of initiative petitions, our Opinion should not be read to suggest that all such challenges must be initiated pre-election. *See, e.g., Dotson v. Kander*, 464 S.W.3d 190, 194 (Mo. banc 2015) (observing that "[i]n contrast to *pre-*election challenges under section 116.190, chapter 115 allows registered voters to contest '[t]he result of *any* election on *any* question' *after* an election has been held"); *Knight v. Carnahan*, 282 S.W.3d 9, 18 (Mo. App. W.D. 2009) (noting that the single subject requirement "applies to [initiative] petitions both before and after Missouri voters have approved a measure.") (citing *United Gamefowl*, 19 S.W.3d at 139).

8

valid signatures had been collected to authorize the secretary of state to certify an initiative petition, and that the measure violated article III, section 50 of the Missouri Constitution because it sought to amend or create more than one article of the constitution); *Ritter v. Ashcroft*, 561 S.W.3d 74, 85-86 (Mo. App. W.D. 2018) (holding that "[c]hallenges to an initiative petition on the basis that it 'contain[s] more than one subject and matters properly connected therewith' are appropriately addressed prior to the election at which the measure is to be submitted to voters") (citing *Missourians to Protect the Initiative Process*, 799 S.W.2d at 828). As such, it is also appropriate for us to entertain Sweeney's challenge on appeal to the entry of Judgment against her on the merits pursuant to Rule 73.01(b) on the basis that she lacked standing to pursue her pre-election challenges.

Sweeney's pre-election challenges to the Initiative Petition do not implicate the Missouri Supreme Court's exclusive jurisdiction, because they do not challenge the substantive constitutionality of any law related to the initiative process, and instead address only whether the Initiative Petition complied with constitutional and statutory provisions relating to the procedure and form of initiative petitions. *Cf. Boeving*, 496 S.W.3d at 503-504 (holding that although challenges to the sufficiency of collected signatures and to whether an initiative petition violated the prohibition against creating or amending more than one article of the constitution were not, on their own, subject to the Supreme Court's exclusive jurisdiction, a third issue in the case raised a substantive constitutional question that was subject to the Court's exclusive jurisdiction, requiring all issues to be submitted to the Court).

As such, this Court has jurisdiction to entertain Sweeney's appeal.

## Standard of Review

"The standard of review for a bench-tried civil case is that set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)."[9]  *Stander v. Szabados*, 407 S.W.3d 73, 78 (Mo. App. W.D. 2013).  We will affirm the circuit court's Judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law.  *Id*.  We view the evidence and reasonable inferences that may be drawn therefrom in the light most favorable to the Judgment, disregarding evidence and inferences to the contrary.  *Id*.

## Analysis

Sweeney raises four points on appeal.  Sweeney's first and second points collectively allege that the circuit court erred in entering Judgment on the merits pursuant to Rule 73.01(b) on the basis that she lacked standing to pursue the Election Challenge because it abused its discretion by refusing her request to reopen the evidence, because the excluded evidence established as a matter of law that she is a "citizen" with standing to pursue a challenge pursuant to section 116.200.1, and because the Rule 73.01(b) Motions alleged that Sweeney had to prove she was a Missouri resident, when section 116.200.1 provides that "any citizen" can bring a challenge.  Sweeney's third point alleges that the circuit court erred in refusing to enjoin the Secretary from certifying the Initiative Petition because the Secretary independently determined that numerous signers on the Initiative Petition were registered voters after local election authorities had determined to the contrary, and that the

---

[9]The Judgment is, in every respect, a judgment on the merits, both under Rule 73.01(b), and because of the circuit court's findings and conclusions determining the merits of the substantive challenges raised in Sweeney's Election Challenge.

Secretary was prohibited from doing so by section 116.140. Sweeney's fourth point alleges that the circuit court erred in refusing to enjoin the Secretary from certifying the Initiative Petition because the Initiative Petition violates the single subject requirement of article III, section 50 of the Missouri Constitution.

We address points one and two together, and then points four and three.

**I**

**The Circuit Court Abused its Discretion in Refusing to Permit Sweeney to Reopen the Evidence, and Committed Legal Error in Granting the Rule 73.01(b) Motions because they Relied on an Erroneous Legal Standard to Establish Standing to Bring a Section 116.200.1 Challenge**

Sweeney first and second points on appeal argue that the circuit court abused its discretion when it refused her request to reopen the evidence, and that the Rule 73.01(b) Motions were erroneously granted because they relied on a legal standard to establish standing under section 116.200.1 that is inconsistent with the statute. We agree.

**A**

After Sweeney concluded her case-in-chief at trial, the Secretary and Proponent made oral Rule 73.01(b) Motions seeking judgment in their favor on the merits[10] because Sweeney failed to put on any evidence that she is a "Missouri resident." The oral Rule 73.01(b) Motions thus presupposed, without argument or analysis, that the phrase "any citizen" in section 116.200.1 means "Missouri resident," and that in the absence of evidence that Sweeney is a Missouri resident, Sweeney did not have standing to challenge the Secretary's certification of the Initiative Petition as sufficient.

---

[10]*See* footnote 5, *supra*.

11

After the Rule 73.01(b) Motions were made, Sweeney's counsel immediately requested to reopen the evidence so Sweeney could testify about her standing to bring a section 116.200.1 challenge. The Secretary and Proponent objected. Sweeney's counsel made an offer of proof through direct examination of Sweeney, who appeared by WebEx within minutes of the request to reopen the evidence. Sweeney was cross-examined by the Secretary and Proponent during the offer of proof. The circuit court took the Rule 73.01 Motions and Sweeney's request to reopen the evidence under advisement, and did not rule either until it entered its Judgment. Following the offer of proof, the Secretary and Proponent rested without presenting evidence, and the parties proceeded with closing arguments.

The circuit court's written Judgment entered the following day sustained the Secretary's and Proponent's objections to Sweeney's request to reopen, and granted the Rule 73.01(b) Motions, entering judgment on the merits against Sweeney because she failed to put on evidence to establish her standing to pursue a section 116.200.1 challenge. The Judgment expressly noted that the circuit court did not rely on or consider the offer of proof testimony in granting the Rule 73.01(b) Motions. Despite granting the Rule 73.01 Motions, the Judgment also made extensive findings of fact and conclusions of law to determine the merits of Sweeney's substantive claims in the Election Challenge.

"Generally, the decision to allow a party to reopen [the evidence] is within the sound discretion of the trial court." *In re Estate of Mapes*, 738 S.W.2d 853, 855 (Mo. banc 1987). However, "'[a] litigant should not be precluded from offering additional evidence simply because counsel has rested his case.'" *LaFevers v. Clothiaux*, 403 S.W.3d 653, 658 (Mo.

12

App. S.D. 2012) (quoting *Conley v. Dee*, 246 S.W.2d 385, 387 (Mo. App. St.L.D. 1952)). "[W]hen there is no inconvenience to the Court or unfair advantage to one of the parties, there is an abuse of discretion . . . upon a refusal to reopen a case and permit the introduction of material evidence, that is evidence that would substantially affect the merits of the action and perhaps alter the Court's decision." *Mapes*, 738 S.W.2d at 855 (quoting *Pride v. Lamberg*, 366 S.W.2d 441, 445 (Mo. 1963)).

It is beyond contest that the evidence Stewart sought to introduce by reopening the evidence was material and would have altered the circuit court's grant of the Rule 73.01(b) Motions. That is because the Rule 73.01(b) Motions were granted by the circuit court without consideration of the offer of proof testimony, and solely because Sweeney presented *no* evidence of her status as a "Missouri resident," (the purported standard for standing posited by the Rule 73.01(b) Motions), during her case-in-chief.

In addition, there is no basis in the record to conclude that there would have been either inconvenience to the circuit court or unfair advantage to Sweeney by permitting Sweeney to reopen the evidence. The circuit court was not inconvenienced "given the fact that the request [to reopen] was made prior to the granting of [the Rule 73.01(b) Motions]." *Mapes*, 738 S.W.2d at 856. Sweeney was available to testify, and did in fact testify, by WebEx within minutes of the Rule 73.01(b) Motions being made, as demonstrated by her offer of proof. After the offer of proof, the Rule 73.01(b) Motions and the pending request to reopen the evidence were taken under advisement, and the parties proceeded to closing arguments, where the merits of the substantive issues raised in Sweeney's Election Challenge were the primary focus. Though the circuit court granted the Rule 73.01(b)

13

Motions in its Judgment, the circuit court's Judgment also made extensive findings of fact and conclusions of law on the merits of Sweeney's substantive challenges to the Secretary's certification of the Initiative Petition. Had the circuit court permitted Sweeney to reopen the evidence, it is apparent that decision would have had a nearly imperceptible impact on the proceedings.

Moreover, it is relevant that this was an abbreviated trial in a substantially expeditated case. It is plain from the record that the parties had been encouraged to streamline the contested issues they expected the circuit court to entertain at trial to enhance the circuit court's ability to enter a judgment less than 24 hours after trial, in order to afford the parties a fighting chance to pursue and complete appellate review before the statutory deadline of September 13, 2022 imposed by section 115.125.3. We recognize that given the Secretary's and Proponent's answers denying the allegation in Sweeney's petition that she is a "citizen, legal voter, resident, and taxpayer of the State of Missouri," Sweeney was on notice that her standing to pursue a section 116.200.1 was technically in issue. But, as the Supreme Court held in *Mapes*, "[i]f a plaintiff, by mistake or inadvertence, fails to produce sufficient evidence at trial to prove his claim, in a situation where the proof seems to be available," it is an abuse of discretion to refuse the plaintiff's request to reopen the evidence. 738 S.W.2d at 856. Under the circumstances in this case, it was an abuse of discretion for the circuit court to refuse Sweeney's request to reopen the evidence.

Our conclusion is consistent with the result reached by our Supreme Court in *Mapes*, where the Court found it to be an abuse of discretion to refuse a plaintiff's request to reopen evidence where the request was raised immediately after motions for directed verdict were

14

made and before they were ruled, where necessary witnesses were readily available to testify, and where the excluded evidence would have avoided a directed verdict. 738 S.W.2d at 855-856. Similarly, in *Moss v. Greyhound Lines, Inc.*, 607 S.W.2d 192, 195-96 (Mo. App. E.D. 1980), the Eastern District concluded that it was an abuse of discretion to refuse a plaintiff's request to reopen evidence where the request was made immediately after the trial court denied the plaintiff's request to reconsider the grant of defendant's oral motion for directed verdict, where the record established the evidence was material, and where "no undue advantage would have accrued to the [plaintiff] if the court would have allowed him to reopen his case[,] [as] [a]ll parties were present, the witness was immediately available and . . . there was no evidence of any inconvenience to the court." And in *Arrow Financial Services, LLC, v. Collier*, 323 S.W.3d 827, 829 (Mo. App. E.D. 2010), the trial court's refusal to reopen the evidence was found to be an abuse of discretion where the "request to reopen evidence to present evidence of the attorneys' fees owed was made within minutes after the close of the evidence[,] [t]here would be no inconvenience to the Court to allow presentation of evidence of attorneys' fees[,] and there would be no unfair advantage to [the party who requested to reopen]." Finally, in *LaFevers*, 403 S.W.3d at 658-659, the Southern District found a trial court's refusal to reopen the evidence to be an abuse of discretion where "excluded deposition testimony was material and could have altered the jury's decision[,] . . . [p]laintiff would have achieved no unfair advantage by reopening her case to present [the] deposition testimony[,] . . . [and] [p]laintiff's request to reopen her evidence to introduce portions of [the] deposition would not have inconvenienced the court."

15

Having found that it was an abuse of discretion to refuse Sweeney's request to reopen the evidence, we are left to determine the remedy for the trial court's error. In the cases cites above, the excluded evidence was material to a plaintiff's substantive claims on their merits, requiring reversal and remand for a new trial, or for additional findings, so the fact-finder could consider the excluded evidence to resolve contested claims. *Mapes*, 738 S.W.2d at 856; *LaFevers*, 403 S.W.3d at 659-660; *Arrow Financial Services, LLC,* 323 S.W.3d at 829; *Moss*, 607 S.W.2d at 196.

Here, in stark contrast, the excluded evidence was not relevant to determining the merits of Sweeney's Election Challenge claims, and instead was relevant only to the threshold issue of Stewart's standing to pursue her substantive claims pursuant to section 116.120.1. "Standing is a question of law, which is reviewed de novo." *Manzara v. State*, 343 S.W.3d 656, 659 (Mo. banc 2011) (citation omitted). As such, we are permitted to review the circuit court's grant of the Rule 73.01(b) Motions for legal error, without remanding this matter to consider the excluded evidence. If the circuit court did commit legal error in granting the Rule 73.01(b) Motions, there is also no need to remand this matter to require the circuit court to determine the merits of Sweeney's Election Challenge, as the Judgment includes the circuit court's findings of fact, conclusions of law, and judgments on the merits of Sweeney's substantive claims.

We turn, therefore, to addressing whether the circuit court committed legal error by granting the Rule 73.01(b) Motions. We conclude that it did.

16

**B**

Section 116.200.1 provides that "*any citizen* may apply to the circuit court of Cole County to compel [the secretary of state] to reverse" a decision to certify an initiative as sufficient or insufficient. (Emphasis added.) The Rule 73.01(b) Motions granted by the circuit court argued that Sweeney failed to put on evidence that she was a "Missouri resident," and thus failed to prove that she had standing under section 116.200.1. On appeal, the Secretary and Proponent continue to argue that "Missouri resident" is the proper legal standard for determining standing under section 116.200.1, even though section 116.200.1 uses the phrase "any citizen."

The term "citizen" is not defined in Chapter 116, though there is nothing about the language or tenor of section 116.200.1 to suggest that the legislature intended to narrowly or artificially restrain the scope of the term. Our primary responsibility in interpreting a statute is "to determine legislative intent from the language of the statute and to give effect to that intent." *Balloons Over the Rainbow, Inc. v. Dir. of Revenue*, 427 S.W.3d 815, 825 (Mo. banc 2014) (citation omitted). "Absent a statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *Id.* (quoting *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999)).

WEBSTERS THIRD NEW INTERNATIONAL DICTIONARY 411 (1961) defines "citizen" as: "an inhabitant of a city or town . . . "; "a member of a state . . ."; and "a native or naturalized person of either sex who owes allegiance to a government and is entitled to reciprocal protection from it and to enjoyment of the rights of citizenship."

17

Other authorities note that the term "citizen" is not a term of exact meaning. For example, 14 C.J.S. Citizens section 2 (August 2022 Update) observes that the term "citizen" is "a term capable of more meanings than one and has been variously defined." The same authority notes:

> In its primary sense, the term "citizen" signifies a person who is vested with the freedom and privileges of a city as distinguished from a foreigner or a person not entitled to its franchises. It may also be properly defined as an inhabitant of a city or a townsperson. In a larger sense, the term "citizen" denotes a person who, as a member of a nation or of a body politic of a sovereign state, owes allegiance to, and may claim reciprocal protection from, its government. It is also sometimes defined as a person who is domiciled in a country, and who is a citizen, although neither native or naturalized, in the sense that he or she takes his or legal status from such country.
>
> . . . A "citizen," pursuant to American law, is . . . variously defined as a person who has a right to vote for representatives in Congress and other public officers, and who is qualified to fill offices; one of the sovereign people; a constituent member of the sovereignty, synonymous with the people; a member of the civil state, entitled to all its privileges; and a free inhabitant born within the United States or naturalized under the laws of Congress. In a political sense, "citizen" may also be defined as a person who has the rights and privileges of a citizen of a state or of the United States.
>
> The particular meaning of the word "citizen" is frequently dependent on the context in which it is found and must always be taken in the sense which best harmonizes with the subject matter in which it is used. A person may be considered a citizen for some purposes and not a citizen for other purposes.

*Id*.

Plainly, the term "citizen" is not readily susceptible to a single, settled dictionary meaning, and is instead a term with varied accepted meanings depending on the context in which the term is used. However, we need not determine the outer parameters of the legislature's intended meaning of the term "citizen" as used in section 116.200.1. We need

18

only determine whether the legislature intended "citizen" to mean (and thus be limited to) "Missouri resident."

The Rule 73.01(b) Motions offered no explanation for equating "citizen" with "Missouri resident," and never mentioned the term "citizen." The Secretary's and Proponent's arguments on appeal presuppose that "citizen" means "Missouri resident," citing no authority to support this critical presumption, nor any explanation for why the legislature did not simply use the phrase "Missouri resident" had that been their intent.

We reject the essential premise of the Rule 73.01(b) Motions, which equates the term "citizen" as used in section 116.200.1 with "Missouri resident." Construing the term "citizen" in section 116.200.1 to mean *only* "Missouri resident," or to even require that one be a "Missouri resident," is not consistent with the multiple, common definitions of "citizen" noted above. Equating "citizen" with "Missouri resident" artificially constrains the term "citizen," and in the process, disregards Missouri jurisprudence (limited as it is) addressing the meaning of "citizen." For example, in *State v. Fairlamb*, 25 S.W. 895, 899 (Mo. 1894), our Supreme Court observed that "[a] citizen is a person born in the United States." (quoting 1 Bouv. Law Dict.). The Court also acknowledged that "citizen" has been defined as "'[o]ne who owes to government allegiance, service, and money by way of taxation, and to whom the state in turn grants and guaranties liberty of person and of conscience, the right of acquiring and possessing property, of marriage and social relations, of suit and defense, and security in person, estate, and reputation.'" *Id.* (quoting 3 Am. & Eng. Enc. Law, 242). And, the Court noted that pursuant to "the fourteenth amendment of the constitution of the United States, 'all persons born or naturalized in the United States,

and subject to the jurisdiction thereof," are expressly declared to be 'citizens of the United States **and** of the state wherein they reside,'" demonstrative of the fact that dual citizenship is both possible and common. *Id*. (quotation omitted).

These definitions of "citizen" are much broader than, and cannot be reconciled with, defining the term "citizen" as used in section 116.200.1 to mean "Missouri resident." Even if "citizen" as used in section 116.200.1 were to be interpreted to mean "***Missouri*** citizens," (an issue we need not resolve), it cannot be said that "Missouri citizen" means "Missouri resident." *See, e.g., Loftus v. Lee*, 308 S.W.2d 654, 657 (Mo. 1958) (citing *Douglas v. New York, New Haven R. Co.*, 279 U.S. 377, 387 (1929) which held that "[a] distinction of privileges according to residence may be based upon rational considerations and has been upheld by this Court, ***emphasizing the difference between citizenship and residence*** . . . .") (emphasis added)). *See also*, 14 C.J.S. Citizens section 13 (August 2022 Update) (observing that "[t]here is some confusion in legal nomenclature with respect to the terms 'citizen,' 'inhabitant,' and 'resident.' 'Citizen' is not necessarily synonymous, or a term convertible with 'inhabitant' or 'resident,' and, in some instances, the distinction is important").

We therefore conclude that it was legally erroneous for the circuit court to grant the Rule 73.01(b) Motions, as in doing so, the circuit court ignored the plain language of section 116.200.1, and instead credited the Secretary's and Proponent's reliance on an incorrect legal standard for determining standing pursuant to 116.200.1. Because it was also (as we have explained) an abuse of discretion for the circuit court to refuse to reopen

20

the evidence to accept Sweeney's offer of proof testimony, it was error to enter Judgment against Sweeney on the merits by granting the Rule 73.01(b) Motions.[11]

Sweeney's first and second points on appeal are granted. The Judgment is reversed to the extent it granted the Rule 73.01(b) Motions and ruled on the merits in favor of the Secretary and Proponent on the basis that Sweeney did not have standing to pursue the Election Challenge.

We now turn our attention to the Judgment's findings and conclusions which entered judgment in favor of the Secretary and Proponent on the merits of Sweeney's substantive challenges to the Secretary's certification of the Initiative Petition. We first address point four on appeal, which involves Sweeney's single subject challenge to the Initiative Petition. We then address point three on appeal, which involves Sweeney's contention that the Secretary had no authority to disregard a local election authority's determination that a signature is invalid because the signer is not a registered voter.

---

[11]Sweeney's offer of proof included testimony that she is a United States citizen; that she owns and maintains a Missouri residence; that she is a Missouri resident; that she is registered to vote in Missouri; and that she has spent most of her time during 2022 in the state of Missouri. On cross-examination, Sweeney testified that she works regularly in Washington D.C., and also owns homes in Virginia and California. Sweeney also testified on cross-examination that she has served on the Jefferson City, Missouri school board, and on "numerous other state and local boards, Chamber of Commerce, Capital Region Medical Center, Rotary, [and] Big Brother Big Sisters."

Sweeney's cross-examination illuminated that the Secretary and Proponent were intent only on challenging Sweeney's status as a Missouri resident, consistent with the Rule 73.01(b) Motions. Beyond contesting Sweeney's status as a Missouri resident, neither the Secretary nor Proponent has argued that Sweeney's other connections with the state of Missouri about which she testified (that she is a Missouri property owner, taxpayer, registered voter, and community leader, and a United States citizen) are insufficient to make her a "citizen" for purposes of section 116.200.1. Though it would not be proper for us to determine the credibility of this testimony, we need not and do not do so, as it would be equally improper for us to credit the Secretary and Proponent with arguments they have not made.

21

## II

### The Initiative Petition does not Violate the Single Subject Requirement

Sweeney's fourth point on appeal alleges that the Initiative Petition violates the single subject requirement set forth in article III, section 50 of the Missouri Constitution, which provides, in pertinent part, that "[p]etitions for constitutional amendments shall not contain more than one . . . subject and matters properly connected therewith."[12] Sweeney's petition contended that the Initiative Petition violates the single subject requirement because it legalizes the recreational use and possession of marijuana under certain circumstances *and* authorizes relief from the criminal consequences of certain past marijuana related offenses through expungement and release from incarceration, probation or parole. Sweeney petition thus complained that the Initiative Petition has both a prospective and retroactive impact that violates the single subject requirement's prohibition against multiple, unrelated matters being contained in a proposed constitutional amendment. At trial and on appeal, Sweeney highlighted additional provisions of the Initiative Petition beyond those raised in her petition in an effort to bolster her contention that the Initiative Petition violates the single subject requirement.

The circuit court rejected Sweeney's single subject challenge. The circuit court did not commit legal error in doing so.

The Initiative Petition proposes to amend article XIV of the Missouri Constitution (addressing medical marijuana use) by modifying section 1 and adding a new section 2.

---

[12]Article XII, section 2(b) of the Missouri Constitution repeats the single subject requirement for proposed constitutional amendments.

22

The official ballot title and fair ballot language for the Initiative Petition summarize the

proposed amendment to article XIV of the Missouri Constitution as follows:

*Official Ballot Title:*

Do you want to amend the Missouri Constitution to:

•       remove state prohibitions on purchasing, possessing, consuming, using, delivering, manufacturing, and selling marijuana for personal use for adults over the age of twenty-one;
•       require a registration card for personal cultivation with prescribed limits;
•       allow persons with certain marijuana-related non-violent offenses to petition for release from incarceration or parole and probation and have records expunged;
•       establish a lottery selection process to award licenses and certificates;
•       issue equally distributed licenses to each congressional district; and
•       impose a six percent tax on the retail price of marijuana to benefit various programs?

State governmental entities estimate initial costs of $3.1 million, initial revenues of at least $7.9 million, annual costs of $5.5 million, and annual revenues of at least $40.8 million.  Local governments are estimated to have annual costs of at least $35,000 and annual revenues of at least $13.8 million.

*Fair Ballot Language:*

A **"yes"** vote will amend the Missouri Constitution to remove state prohibitions on the purchase, possession, consumption, use, delivery, manufacture, and sale of marijuana for personal use for adults over the age of twenty-one.

The amendment would also allow individuals with certain marijuana-related offenses to petition for release from prison or parole and probation and have their records expunged; along with imposing a six percent tax on the retail price of recreational marijuana.

A **"no"** vote will not amend the Missouri Constitution and the sale and use of marijuana for recreational purposes will remain prohibited under current law.  Medical marijuana would remain unchanged.

> If passed, this measure will impose a 6 percent tax on the retail price of recreational marijuana.

As Sweeney correctly notes, the Initiative Petition prospectively authorizes the lawful use and possession of recreational marijuana in certain circumstances. And the Initiative Petition authorizes relief from past criminal consequences by permitting those with marijuana related offenses that would be prospectively lawful under the amendment to petition for expungement or release from incarceration, probation or parole. The issue is whether the constitutional amendment proposed by the Initiative Petition "contain[s] more than one . . . subject and matters properly connected therewith" because of its prospective and retroactive impact on decriminalizing the recreational use and possession of marijuana in certain circumstances. Art. III, section 50, Missouri Constitution. We conclude that it does not.

> The purpose of the single subject requirement is settled:
>
> [T]he purpose of the prohibition on multiple subjects in a single ballot proposal is to prevent "logrolling," a practice familiar to legislative bodies whereby unrelated subjects that individually might not muster enough support to pass are combined to generate the necessary support. The prohibition is intended to discourage placing voters in the position of having to vote for some matter which they do not support in order to enact that which they earnestly support. The single subject matter rule is the constitutional assurance that within the range of a subject and related matters a measure must pass or fail on its own merits.

*Missourians to Protect the Initiative Process*, 799 S.W.2d at 830 (internal citation omitted) (citing *State ex rel. Callaghan v. Maitland*, 246 S.W. 267, 272 (Mo. banc 1922)); *Ritter*, 561 S.W.3d at 85. To establish that the single subject requirement has been violated requires more, however, than a simple demonstration that an initiative petition effects

24

multiple, discrete changes.  Instead, "[a] measure may effect multiple changes yet have a single subject if all its provisions are connected with a central controlling purpose."[13] *Knight v. Carnahan*, 282 S.W.3d 9, 18 (Mo. App. W.D. 2009), (citing *United Gamefowl*, 19 S.W.3d at 140).  "In addressing a 'single subject' challenge, we read an initiative petition in a manner favoring its validity."  *Ritter*, 561 S.W.3d at 86.  Our Supreme Court has expressly directed that:

> When reviewing a single subject challenge to an initiative petition, this Court must liberally and non-restrictively construe the petition in such a way that the provisions connected with or incident to the central purpose of the proposal are harmonized and not treated as separate subjects. A proposal may amend several articles in the constitution so long as all proposals are germane to a single purpose. In reviewing multiple subject claims, this Court "must scrutinize the proposal to see if all matters included relate to a readily identifiable and reasonably narrow central purpose."

*Comm. For A Healthy Future, Inc. v. Carnahan*, 201 S.W.3d 503, 511 (Mo. banc 2006) (internal citations omitted) (citing and quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 830-31); *see Ritter*, 561 S.W.3d at 86 (quoting *Comm. For A Healthy Future, Inc.*, 201 S.W.3d at 511).

Construing the Initiative Petition "liberally and non-restrictively," we conclude that the initiative's multiple provisions all relate to a readily identifiable and reasonably narrow central purpose: decriminalizing the recreational use and possession of marijuana under certain circumstances.  That the Initiative Petition does so both prospectively and

---

[13]"Provisions [in an initiative petition] that are incidental to effecting the measure's central purpose are not treated as separate subjects."  *Knight*, 282 S.W.3d at 18 (citing *United Gamefowl*, 19 S.W.3d at 140).

25

retroactively is immaterial, as the central controlling purpose of the measure is served through both prospective and retroactive application of the measure.

Our conclusion is consistent with the Supreme Court's holding in *Committee For a Healthy Future, Inc.*, where the challengers to an initiative petition argued that the proposed measure altered and amended multiple articles of the constitution, and contained "divergent subjects . . . , namely tobacco cessation and an expansion of the state's Medicaid program, which they argued is unrelated to smoking." 201 S.W.3d at 511. The Supreme Court disagreed, noting that although the challengers "posit that there are two divergent purposes and subjects within the proposal, the clear, single purpose of the proposed amendment is to raise and disburse a tax." *Id*. The Court thus concluded that "raising taxes on tobacco products and disbursing funds to tobacco cessation programs and to public health programs that include treating tobacco-related illnesses . . . do not violate the single subject restriction of the state constitution. *Id*. at 511-512.

Similarly, in *Ritter*, this Court concluded that an initiative petition that proposed to amend multiple sections within a single article of the constitution did not violate the single subject requirement. 561 S.W.3d at 86. Notably, the initiative petition in *Ritter* addressed multiple topics as it: (1) specified when legislators and employees of the General Assembly could serve as paid lobbyists; (2) prohibited legislators and legislative employees from accepting gifts of a particular value from paid lobbyists; (3) prohibited Senate and House candidates from accepting campaign contributions over a certain amount in an election cycle; (4) prohibited candidates from accepting contributions from federal political action committees unless the committee filed certain financial disclosure reports; (5) declared

26

legislative records as public records and legislative meetings as public meetings in certain circumstances; (6) prohibited legislators and legislative candidates from engaging in political fundraising activities on State property; (7) modified the apportioning procedure for House and Senate Districts; (8) created a new position called the "non-partisan state demographer" and provided instruction for that position; and (9) described the process for selecting, and rules for, reapportionment commissions. *Id*. at 80-81. We concluded that these multiple, discrete provisions in the initiative petition satisfied the single subject requirement because they all "relate[d] to a single central purpose: regulating the legislature to limit the influence of partisan or other special interests." *Id*. at 86.

Several other Missouri cases confirm that successful single subject challenges are a rarity. *See Buchanan v. Kirkpatrick*, 615 S.W.2d 6, 13-14 (Mo banc 1981) (holding that an initiative petition adopted by voters which amended article X of the constitution to impose taxation and spending lids on state government, to require state government to continue financial support of local governments, and to impose a tax lid and limits on revenues derived from property assessments on local governments, did not violate the single subject rule because the multiple provisions were "properly connected" with the "central purpose of limiting taxes and governmental expenditures within Missouri"); *Knight*, 282 S.W.3d at 14, 18 (holding that an initiative petition that proposed to amend the constitution to repeal gambling loss limits, to prohibit future loss limits, to restrict when identification could be required to enter gambling areas, to restrict the number of casinos, to increase the casino gambling tax, to create an education fund from gambling tax proceeds, and to require annual audits of the fund, did not violate the single subject

27

requirement because the central purpose of the measure was the regulation of gambling and gambling revenues); *Kuehner v. Kander*, 442 S.W.3d 224, 226-227, 231 (Mo. App. W.D. 2014) (holding that an initiative petition that addressed when certificated staff would not be considered at-will employees of a school district, prohibited school districts that receive certain funding from entering certain contracts with certificated staff, provided instructions for implementing a standards-based performance evaluation system, provided additional causes for demoting or discharging certificated staff, and described the right of certificated staff to organize and bargain collectively, did not violate the single subject requirement because the measure had a readily identifiable and reasonably narrow central focus "on the parameters of teacher employment and retention within school districts").

The single subject requirement in article III, section 50 of the Missouri Constitution requires only that multiple, discrete provisions in an initiative petition all be related to a single central purpose. In this context, "subject" does not refer to the number of discrete changes envisioned by a proposed constitutional amendment, and instead refers to whether all provisions in a proposed constitutional amendment "are germane to a single purpose." *Comm. for a Healthy Future, Inc.*, 201 S.W.3d at 511. The Initiative Petition does not violate the single subject requirement of article III, section 50 of the Missouri Constitution because its discreet provisions, though effecting more than one change, all relate to a readily identifiable, and reasonable narrow, single purpose--the decriminalization of marijuana use and possession under certain circumstances.

Our conclusion is not altered by the additional arguments Sweeney raised at trial or on appeal about the content of the Initiative Petition. Sweeney complains that the Initiative

28

Petition creates a new state officer located in the Department of Health and Senior Services who is charged with creating and implementing "public education programming" relating to opportunities in the sale or production of marijuana. Sweeney complains that the Initiative Petition effectively modifies Chapter 610, Missouri's Sunshine Law, by addressing which public records from marijuana applicants or licensees will be closed records. Sweeney complains that the Initiative Petition modifies procedures for securing search warrants in cases relating to marijuana use or possession by requiring law enforcement to verify whether the targeted person is a qualifying patient or primary caregiver. Sweeney complains that the use of "no-knock" warrants is restricted by the Initiative Petition in connection with certain marijuana offenses. Sweeney complains that the Initiative Petition imposes an additional evidentiary requirement to secure a conviction of someone who is operating a boat, car, or other motorized vehicle while under the influence of marijuana.

Setting aside our concern that these provisions of the Initiative Petition were not mentioned in Sweeney's petition, we nonetheless conclude that the additional provisions Sweeney now highlights are not unlike those in *Committee for a Healthy Future, Inc.*, *Ritter*, *Kuehner*, and other cases herein summarized. The additional provisions all relate to a readily identifiable, and reasonable narrow, single purpose--the decriminalization of marijuana use and possession under certain circumstances.

The circuit court correctly concluded that the Initiative Petition does not violate the single subject requirement in article III, section 50 of the Missouri constitution. Sweeney's fourth point on appeal is denied.[14]

## III

**The Secretary Properly Determined that the Initiative Petition was Signed by a Sufficient Number of Registered Voters to Permit its Certification**

Sweeney third point on appeal alleges that the Secretary erroneously certified the Initiative Petition because an insufficient number of valid signatures were secured to permit certification as required by article III, section 50 of the Missouri Constitution. Specifically, Sweeney alleges that the Secretary certified and counted signatures determined by the Secretary to belong to registered voters after local election authorities had determined that the signers were not registered voters. Sweeney contends that the Secretary was prohibited by section 116.140 from disregarding a local election authorities' determination that a signature is invalid, even if the Secretary independently determines that the signer is a registered voter. The circuit court found Sweeney's claim to be without merit. The circuit did not err in doing so.

Article III, section 50 of the Missouri Constitution provides in pertinent part that "[i]nitiative petitions proposing amendments to the constitution shall be signed by eight

---

[14]In the argument portion of her brief, Sweeney raises a new and distinct challenge to the Initiative Petition that was not pled in Sweeney's petition, that is not addressed in the Judgment (suggesting strongly that it was not timely or effectively raised as an issue with the circuit court), and that exceeds the scope of Sweeney's point relied on. Specifically, Sweeney's brief makes the additional argument that the Initiative Petition violates article III, section 50 of the Missouri Constitution because it amends more than one article of the constitution. Even if we could be persuaded that this argument was preserved by being raised below, "[a]rguments advanced in the brief but not raised in the point relied on are not preserved, and will not be addressed by this court." *Burg v. Dampier*, 346 S.W.3d 343, 354 (Mo. App. W.D. 2011) (citing Rule 84.04(e)).

percent of the legal voters in each of two-thirds of the congressional districts in the state[.]" Because Missouri has eight Congressional Districts, initiative petitions must be signed by eight percent of the legal voters in six or more of those districts. "Legal" voters is accepted to mean "registered" voters for purposes of determining the validity of a signature on an initiative petition. *Ketcham v. Blunt*, 847 S.W.2d 824, 827 (Mo. App. W.D. 1992) (citing *Scott v. Kirkpatrick*, 513 S.W.2d 442, 444 (Mo. banc 1974) (holding that "unless a person is registered he is not at any time legally entitled to vote")).[15] Thus, where the sufficiency of signatures in favor of an initiative petition is challenged, the determining question to be resolved is whether a sufficient number of registered voters within at least six of Missouri's eight Congressional Districts in fact signed the petition. *Comm. for a Healthy Future*, *Inc.*, 201 S.W.3d at 508 (holding that "article III, section 50 of the Missouri Constitution makes clear that the determining factor in analyzing whether initiative petitions are sufficient is whether they contain the signatures of eight percent of the legal voters in each of two-thirds of the congressional districts in the state") (citing *United Labor Committee of Missouri v. Kirkpatrick*, 572 S.W.2d 449, 455 (Mo. banc 1978)). A challenger to the sufficiency of signatures must therefore establish that signatures are actually invalid, and that the number of invalid signatures disqualifies the initiative petition from certification pursuant to article III, section 50 of the Missouri Constitution.

---

[15]However, the formula for calculating the number of "legal (registered) voters" against which eight percent is calculated is not so simple as calculating eight percent of all "registered voters," and is instead controlled by article III, section 53 of the Missouri Constitution, which provides in pertinent part that "[t]he total vote for governor at the general election last preceding the filing of any initiative or referendum petition shall be used to determine the number of legal voters necessary to sign the petition." *See Ketcham*, 847 S.W.2d at 829 ("The insinuation into [Article III,] sections 50 and 53 of the interpolation that the computation of the signatures required for the initiative is based upon the number of people registered, and so could have voted, rather than those that did vote, is sustained by neither the history and text of the provisions nor by precedent.")

In determining whether a challenger has sustained this burden, we remain mindful that "[t]he courts of this state must zealously guard the power of the initiative petition process that the people expressly reserved to themselves in article III, section 49." *Boeving*, 496 S.W.3d at 506. "To that end, '[c]onstitutional and statutory provisions relative to initiative are liberally construed to make effective the people's reservation of that power.'" *Id*. (quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 827). Our Courts have consistently refused to burden the peoples' right to seek to amend the Missouri Constitution based on alleged procedural or technical flaws in the collection or certification of signatures for which the signers bear no fault. As was emphasized by our Supreme Court in *United Labor*, 572 S.W.2d at 454, "[t]o allow form to rule over substance is to permit . . . defeat [of] the initiative submission in spite of the fact that the proper number of voters have done all they can to comply with the initiative procedure." This refrain was repeated in *Committee for a Healthy Future, Inc*., 201 S.W.3d at 509, where our Supreme Court held:

> *United Labor* has not been invalidated by changes in the election laws and continues to establish the proper focus--Do the requisite numbers of signatures appear on the petition? The General Assembly has not declared the failure to comply with [a signature collection statute] to be fatal . . . . The circuit court properly focused on the signatures' validity and properly rejected [the challenger's] attempt to invalidate signatures because of errors committed by persons other than the signers.

Our Supreme Court reiterated this principle yet again in crisp and unequivocal terms in *Boeving*, 496 S.W.3d at 507, when it held that "in the absence of any clear and

unambiguous statutory requirement invalidating signatures gathered on petition pages . . . the Court will not infer such a requirement."[16]

It is within this framework that Sweeney's challenge of the Secretary's certification of signatures must be gauged. Sweeney complains that the Secretary certified some signatures to be valid signatures of registered voters even though the signatures were initially designated by local election authorities not to be valid signatures of registered voters. For Sweeney's challenge to prevail, Sweeney must establish: (i) that a clear and unambiguous statute prohibited the Secretary from determining that a signature belonged to a registered voter after a local election authority determined to the contrary; and (ii) that the number of signatures prohibitively validated by the Secretary was of a sufficient quantity to cause the number of registered voters who signed the Initiative Petition to fall below the requirements of article III, section 50 of the Missouri Constitution. Sweeney has sustained neither burden.

## A

Section 116.120.1 provides that the secretary of state "*shall*" examine an initiative petition "to determine whether it complies with the Constitution of Missouri and with this chapter." The secretary of state's *mandatory* duty in this regard includes the obligation to verify that an initiative petition has the requisite number of signatures of registered voters required by article III, section 50 of the Missouri Constitution.

---

[16]Even clear and unambiguous statutory requirements invalidating signatures gathered on initiative petition pages remain subject to a potential claim that the requirement is unconstitutional. *Boeving*, 496 S.W.3d at 507 (quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 827 ("Statutes that place impediments on the initiative power that are inconsistent with the reservation found in the language of the constitution will be declared unconstitutional.")). No such challenge has been raised in this case.

33

The manner in which the secretary of state fulfills this mandatory duty is not clearly, unambiguously, or unequivocally limited by *any* statutory provision. Chapter 116 does authorize two techniques and measures that *may* be employed to verify signatures at the secretary of state's discretion. *See* section 116.120.1-4 (discussing the manner in which the secretary of state "*may* verify the signatures on the [initiative] petition by use of random sampling"); section 116.130 (discussing the manner in which the secretary of state "*may* send copies of petition pages to election authorities to verify that the persons whose names are listed as signers to the petition are registered voters") (emphasis added). However, these permissive techniques and measures are not expressed to the exclusion of one another, or to the exclusion of any other technique or measure the secretary of state might elect to employ to fulfill the mandatory duty to verify that an initiative petition has the requisite number of signatures of registered voters required by article III, section 50 of the Missouri Constitution. We will not infer such a restraint. *See Boeving*, 496 S.W.3d at 507 (holding that "in the absence of any clear and unambiguous statutory requirement invalidating signatures gathered on petition pages . . . the Court will not infer such a requirement").

Sweeney nonetheless argues that once the Secretary sought input from local election authorities regarding the validity of signatures pursuant to section 116.130, the Secretary was prohibited from utilizing any other technique or measure to independently determine that signatures belonged to registered voters. Sweeney's petition alleges that the Secretary "certified and counted signatures that were marked through by . . . local election authorities," and relies on section 116.130.1 to challenge the Secretary's certification of the

34

sufficiency of signatures on the Initiative Petition. Specifically, Sweeney's petition relies on the following language in section 116.130.1:

> Each election authority shall check the signatures against voter registration records in the election authority's jurisdiction, but the election authority shall count as valid only the signatures of persons registered as voters in the county named in the circulator's affidavit. ***Signatures shall not be counted as valid if they have been struck through or crossed out***.

(Emphasis added.) Sweeney's petition contends that local election authorities "struck through" signatures on petition pages that were determined not to be registered voters, and that the Secretary thereafter counted some of those signatures as valid, in violation of the highlighted provision in section 116.130.1.

This argument is facially absurd, as the highlighted provision in section 116.130.1, read in context, plainly applies to limit a local election authority's authority to count as valid any signature on a petition page that is struck through or crossed out ***at the time the page is received by the local election authority for review***. Section 116.130.1 does not clearly, unequivocally or unambiguously prohibit the Secretary from independently validating the registered voter status of signers whose signatures have been struck through or crossed out on petition pages ***by local election authorities***. To hold otherwise would be to improvidently disenfranchise voters whose signatures have been erroneously stricken or crossed through by a local election official through no fault of the signer. *Comm. for a Healthy Future, Inc.*, 201 S.W.3d at 509 (citing *United Labor*, 572 S.W.2d at 454).

Perhaps recognizing the futility of the interpretation of section 116.130.1 argued in her petition, Sweeney has abandoned reliance on section 116.130.1 on appeal. Instead, Sweeney now relies exclusively on section 116.140 to argue that the Secretary was

35

statutorily prohibited from overriding a local election authority's determination that a signer on a petition page is not a registered voter.

Section 116.140 is not mentioned at all in Sweeney's petition. Nor are there any allegations in the petition that could be construed to argue a violation of the section 116.140, which provides:

> Notwithstanding certifications from election authorities under section 116.130, the secretary of state *shall have authority not to count* signatures on initiatives or referendum petitions which are, in his opinion, forged or fraudulent.

(Emphasis added.) Even overlooking our rather serious question that a violation of section 116.140 was not pled in Sweeney's petition,[17] it is plain that Sweeney's reliance on section 116.140 is unavailing. Section 116.140 only addresses the limits imposed on the secretary of state to disregard a local election authority's certification of a signature as *valid*. *See Bradshaw v. Ashcroft*, 559 S.W.3d 79, 86 (Mo. App. W.D. 2018) (holding that "[o]nce local election authorities *certify the validity of signatures* on an initiative petition, the secretary of state is afforded no statutory authority to disregard the certification, save the limited authority provided by section 116.140") (emphasis added). Section 116.140 does *not* address at all the secretary of state's authority to disregard a local election authority's determination that a signature is *invalid*.

This is a distinction of significance, as it aligns with the requirement to construe statutory provisions relative to the power of the initiative petition "'to make effective the

---

[17]We are aware that Sweeney did argue at trial that section 116.140 prohibited the Secretary from disregarding a local election authority's determination that a signature is invalid because the signer is not a registered voter.

36

people's reservation of that power.'" *Boeving*, 496 S.W.3d at 506 (quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 827). It is one thing for section 116.140 to plainly limit the secretary of state's authority ***not to count*** a signature determined to be ***valid*** by a local election authority. In the absence of such a limitation, the people's initiative power could be impeded by valid votes being later declared invalid by the secretary of state. It is quite another thing to infer from section 116.140's silence on the subject that the secretary of state has no authority to ***count*** a signature as valid if the secretary determines that a local election authority erroneously designated the signature to be ***invalid***. The people's initiative power would be impeded by such an inference, since supporters of an initiative who bear no fault for a local election authority's erroneous designation of their signatures as invalid would be deprived of a voice. As our Supreme Court held in *United Labor*, "[t]he uppermost question . . . is whether or not the statute itself makes a specified irregularity fatal . . . If not, courts will not be astute to make it fatal by judicial construction. 572 S.W.2d at 454 (citations and quotations omitted). "[C]onstruction of a law as would permit the disenfranchisement of large bodies of voters, because of an error of a single official, should never be adopted where the language in question is fairly susceptible of any other." *Id.* (quotation omitted). "'If the validity of the voters' signatures can be otherwise verified, their signatures should not be invalidated by'" a local election authority's error in designating the voter as not registered. *Comm. for a Healthy Future, Inc.* 201 S.W.3d at 509 (quoting *United Labor*, 572 S.W.2d at 454).

We reject, therefore, Sweeney's contention that because section 116.140 fails to address the secretary of state's authority to validate signatures designated as invalid by a

local election authority, we should apply the maxim of *expressio unius est exclusio alterius* to infer that the secretary of state is prohibited from disregarding a local election authority's designation of a signature as invalid. Sweeney seeks to limit the Secretary's authority, and thereby ignore signatures which the Secretary has determined are valid, based on a negative implication. Sweeney's contention is in direct and irreconcilable conflict with *Boeving's* guidance that "in the absence of any clear and unambiguous statutory requirement invalidating signatures gathered on petition pages . . . the Court will not infer such a requirement." 496 S.W.3d at 507. In any event, the Supreme Court has made clear that *expressio unius* "'is to be used with great caution,'" and only where "'a strong contrast'" establishes that what was "'omitted must have been intended for the opposite treatment'" compared to what is expressly stated in a statutory provision. State ex rel. Hawley v. Pilot Travel Ctrs., LLC, 558 S.W.3d 22, 31 (Mo. banc 2018) (quoting *Six Flags Theme Parks, Inc. v. Dir. of Revenue*, 179 S.W.3d 266, 270 (Mo. banc 2005)). That standard is not met by section 116.140.

Our decision in *Ketcham* lends analogous support to the conclusion that determinations by local election authorities about the *invalidity* of signatures is not controlling on the secretary of state, and instead, that the ultimate issue in addressing a signature challenge to certification of an initiative petition is always whether the initiative petition has, in fact, been signed by a sufficient number of registered voters to satisfy the requirements of article III, section 50. In *Ketcham*, the secretary of state certified that an initiative petition received a sufficient number of signatures (16,256) in the eighth Congressional District, and did so by using the "sum of the counts" provided by the local

38

election authorities in the counties in that district from whom the secretary sought signature verification as permitted by section 116.130. *Id*. at 830. Following a challenge that questioned whether sufficient valid signatures supported certification of the initiative petition, the secretary of state conducted a line by line recount of the "R"[18] marks on the local election authorities' petition sheets (in lieu of relying on the sum of the counts provided by each election authority), and in the process concluded that there were 16,753 valid signatures. *Id*. The challenger to the initiative petition argued that the secretary of state was bound by his initial certification of 16,256 valid signatures. *Id*. "The increase in the final count of the secretary of state, from 16,256 to 16,753 valid signatures of registered voters on the eight congressional district state petitions, was essentially the result of an arithmetic error by [a] county clerk . . . who certified . . . fewer 'R' signatures than were actually on the petitions." *Id*. at 831. The challenger argued that "the undercounted . . . signatures could not be used to qualify the petitions." *Id*. We disagreed, holding that "[t]he constitutional right of the people to the initiative . . . cannot be made to depend upon the . . . aptitude of the public official." *Id*.

*Ketcham* is instructive. It emphasizes that "[i]t is the secretary of state who is charged with the ultimate administrative determination as to whether [a] petition complies with the Constitution of Missouri and with the statutes." *Id*. at 830 (citing section 116.120.1; section 116.150; *Missourians to Protect the Initiative Process*, 799 S.W.2d at 828). And it analogously holds that in determining whether signatures on a petition are

---

[18]"R" was meant to designate that a signer is a registered voter.

valid signatures of registered voters, the secretary of state is not bound by the erroneous decisions or technical mistakes of local election authorities. Instead, as we have previously stated, the ultimate, determinative question is whether an initiative petition has, in fact, been signed by a sufficient number of registered voters.

No clear, unequivocal, or unambiguous statutory provision limits the secretary of state to using only the techniques or mechanisms for validating signatures described in sections 116.120 and 116.130 to fulfill the mandatory obligation to ensure that an initiative petition has been signed by a sufficient number of registered voters to permit the measure's certification for inclusion on a ballot. No clear, unequivocal, or unambiguous statutory provision prohibits the secretary of state from using other techniques or measures to validate signatures in addition to, and commensurately with, the techniques and measures authorized for discretionary use by sections 116.120 and 116.130. No clear, unequivocal, or unambiguous statutory provision prohibits the secretary of state from independently determining that signatures belong to registered voters after a local election authority has determined to the contrary. We will not infer such restraints or prohibitions on the secretary of state's ability to certify that signatures on an initiative petition are valid signatures of registered voters. *Boeving*, 496 S.W.3d at 507.

**B**

Separate from her claim that the Secretary was bound by local election authority determinations that a signature is invalid, Sweeney has not proven that ***any*** signature certified by the Secretary as valid was not, in fact, the signature of a registered voter. Sweeney has thus failed to establish that an insufficient number of registered voters within

40

at least six of Missouri's eight Congressional Districts signed the Initiative Petition. Because the ultimate, determinative question is whether a sufficient number of registered voters within at least six of Missouri's eight Congressional Districts signed the Initiative Petition as required by article III, section 50 of the Missouri Constitution, Sweeney's challenge to the sufficiency of signatures fails. *Comm. for a Healthy Future, Inc.*, 201 S.W.3d at 508 (holding that "the determining factor in analyzing whether initiative petitions are sufficient is whether they contain the signatures of eight percent of the legal voters in each of two-thirds of the congressional districts in the state") (citing *United Labor*, 572 S.W.2d at 455).

The circuit court did not err in concluding that the Secretary properly certified that the Initiative Petition was signed by a sufficient number of registered voters in six of Missouri's eight Congressional Districts, and thus satisfied the requirements of article III, section 50 of the Missouri Constitution as to permit placement of the measure on the November 8, 2022 general election ballot. Sweeney's third point on appeal is denied.

### Conclusion

For the reasons set forth above, the Judgment of the circuit court is reversed in part and affirmed in part. The Judgment's grant of the Secretary's and Proponent's Rule 73.01(b) Motions and corresponding entry of judgment against Sweeney on the merits based on a lack of standing to pursue a challenge under section 116.200.1 is reversed. The Judgment's entry of judgment in favor of the Secretary and Proponent and against Sweeney on the merits of Sweeney's substantive challenges to the Secretary's certification of the Initiative Petition as sufficient is affirmed. As such, the Secretary correctly certified the Initiative

Petition as sufficient, and correctly directed that the Initiative Petition appear on the November 8, 2022 general election ballot.

_____
Cynthia L. Martin, Judge

All concur